**R.J.F. FABRICS, INC., Plaintiff,**

v.

**The UNITED STATES, the United States Customs Service, Regional Commissioner of Customs At New York, and the Area Director of Customs At Newark, Defendants.**

**Court No. 86–11–01376.**

United States Court of International Trade.

March 18, 1987.

Soller, Singer & Horn (Carl R. Soller, Gerald B. Horn, Melvin E. Lazar, and Margaret H. Sachter), New York City, for plaintiff.

Richard K. Willard, Asst. Atty. Gen., Washington, D.C., Joseph I. Liebman, Atty. in Charge, Intern. Trade Field Office, Commercial Litigation Branch, Civ. Div., U.S. Dept. of Justice, New York City (Florence M. Peterson), for defendants; Deborah Rand, Asst. Regional Counsel, U.S. Customs Service, Washington, D.C., of counsel.

## OPINION

TSOUCALAS, Judge:

This opinion represents the final turn, in this Court, on the tortuous road that this matter has travelled. This case, which has been at times the subject of daily developments, has alternatively exhibited fascinating and frustrating facets, and has raised questions concerning jurisdiction, discovery, the effect of related criminal proceedings, and the quantum of proof neces-

sary to overcome the presumption in favor of Customs' decisions.

### Background [1]

By notice dated July 1, 1986, Customs announced that "live" entry procedures, barring the exercise of immediate delivery privileges, would be applied to certain shipments of textiles in an effort to prevent circumvention of "quota and visa requirements by transshipping merchandise through Japan and entering it as a product of Japan." 51 Fed.Reg. 23,736 (1986). On July 2 and July 11, 1986, Customs denied entry of the subject merchandise, described as "100% Polyester Double Georgette Piece Dyed, Textile Piece Goods" and alleged by plaintiff R.J.F. Fabrics, Inc. (hereinafter "RJF") to be a product of Japan. On August 15, 1986, the goods were seized pursuant to 19 U.S.C. § 1592 (1982) and 18 U.S.C. § 545 (1982). The federal defendants (hereinafter "defendant" or "United States") allege that the textiles were actually a product of Korea and were offered for entry into the United States with false entry papers in an attempt to by-pass quota/visa restrictions on Korean textiles.

Upon denial of the protest against the exclusion of its merchandise, plaintiff commenced an action in this Court seeking a preliminary injunction—returning the textiles to its custody—as well as declaratory relief concerning the country of origin of the goods. The Court denied the request for injunctive relief but ultimately assumed jurisdiction "for the purpose of issuing a declaratory judgment as to the true country of origin of the goods." *R.J.F. Fabrics, Inc.*, 651 F.Supp. at 1438.

On December 16, 1986, defendant moved for a stay of the civil action in favor of related criminal proceedings commenced in the United States District Court for the Southern District of New York. Defend-

ant explained that Customs instituted an investigation, in February 1984, into the transshipment of textiles after import specialists at the Port of Los Angeles, California, uncovered what was believed to be evidence of Korean man-made textile fabric entered as a product of Japan. The probe soon spread both domestically and internationally. In connection with the investigation, a number of search warrants were directed against the premises of importers in several cities. In November 1985, the criminal investigation of RJF was referred to an Assistant United States Attorney in the Southern District of New York. On August 11, 1986, a search warrant was executed on plaintiff's premises in New York City on probable cause that materials relevant to the alleged fraudulent importation scheme might be recovered.

Of particular significance was defendant's representation that, subsequent to the date of the order exercising jurisdiction over plaintiff's claim for declaratory relief, the criminal case against plaintiff had been presented to a grand jury. Defendant explained that it had postponed discovery at plaintiff's request after negotiations with the U.S. Attorney's office, involving possible withdrawal of the instant action, had begun. When those negotiations collapsed, defendant moved to stay these proceedings. Defendant argued that its ability to conduct discovery had been hampered by certain developments related to the criminal proceedings. For example, Mr. Mark Cassuto, described by defendant as plaintiff's buying agent, had been arrested.[2] Mr. Isaac Cavaliero, Secretary/Treasurer of RJF, became unavailable due to the exercise of his Fifth Amendment privilege against self-incrimination. Additionally, while the record is not entirely clear on this point, it appears that Mr. Richard Fiorillo,

---

1. The Court has issued two prior opinions in this action. The reader is referred to these opinions for a more complete exposition of previous developments. *See R.J.F. Fabrics, Inc. v. United States*, 10 CIT ——, 651 F.Supp. 1437 (1986); *R.J.F. Fabrics, Inc. v. United States*, 10 CIT ——, 651 F.Supp. 1431 (1986).

2. At a conference with the Court, plaintiff's counsel, without elaboration, denied that Mr.

Cassuto was plaintiff's buying agent. Mr. Cassuto's attorney, in a letter to defendant's counsel, has described his client as acting as an "importer's agent." Further, he explained that Mr. Cassuto has been advised to assert his Fifth Amendment privilege at a deposition that was to be held on December 22, 1986. Letter from Angelo T. Cometa to Florence M. Peterson (Dec. 18, 1986).

President of RJF, would be similarly unavailable.

A conference concerning the motion to stay was held in chambers, between the Court, counsel for the parties, Ms. Deirdre Daly, an Assistant United States Attorney in charge of the criminal matter, and Mr. Steven Yagoda, a special agent for Customs. At that time, the Court, over plaintiff's objection, viewed, *in camera*, certain materials presented by Ms. Daly and Mr. Yagoda relating to the alleged transshipment scheme. Several days later, the Court stayed plaintiff's action for a period of twenty-one (21) days. *See R.J.F. Fabrics, Inc.*, 651 F.Supp. at 1441.[3] The Court was concerned that, although the sole issue in the case at bar was that of country of origin, the civil discovery process might be abused to gain information not obtainable under the more limited criminal discovery rules. Moreover, defendant's ability to conduct discovery had been curtailed by the legitimate noncooperation of plaintiff's agents. It was noted that upon termination of the initial period of stay, all relevant factors, including the progress of the criminal proceedings, would be considered in deciding whether to renew the stay. It soon became apparent that, despite the clear impression previously conveyed to the Court, defendant had no intention of expeditiously pursuing the criminal case, nor of instituting civil forfeiture proceedings. At this point, the Court concluded that the tension between plaintiff's interest in continuing a properly commenced civil action and the public interest in an unimpeded criminal investigation must be resolved by not renewing the stay. Accordingly, the case was scheduled for trial.

### Trial

On the day this action was scheduled for trial, counsel for plaintiff informed the Court that it was not prepared to present its case. The Court offered plaintiff the option of either commencing trial or continuing the action for two months. Despite an objection, plaintiff opted to commence trial immediately.

Plaintiff called the following witnesses: Mr. George A. McIntyre, Customs Inspector; Mr. Andrew J. Boland, Import Specialist; Mr. Rudolpf W. Stierle, Supervisory Paralegal Specialist; Mr. Henry Kleinpeter, Mr. Anthony J. Diiorio, Mr. Steven Yagoda, Special Agents for Customs; and Mr. Peter Jacobus, owner of Trimodal International, Ltd., plaintiff's customhouse broker.[4] Plaintiff offered into evidence, *inter alia*, the entry documentation contained in the government agents' files relevant to the subject goods. Defendant made clear that it objected to the admission of these documents to the extent that they were offered to prove the country of origin of the textiles. Trial Transcript at 81–82 (hereinafter "Tr. at ——"). The testimony of plaintiff's witnesses can be summarized as follows.

Mr. McIntyre is a Customs inspector. Tr. at 40–41. His duties, which are more limited than those of a Customs investigative agent, consist of reviewing documents

---

**3.** In response, plaintiff's counsel wrote to the Court seeking reconsideration of the order granting a stay. Letter from Gerald B. Horn (Dec. 23, 1986). At the outset, I note that the proper vehicle for such a request is a formal motion. In any event, plaintiff, while recognizing the Court's authority to grant a stay, suggested that "due process dictates that the government either release this merchandise ... or that the Court afford us an opportunity for a determination on the merits herein as quickly as possible." *Id.* While a due process claim has never been formally briefed or presented to this Court, it should be noted that plaintiff chose to litigate the country of origin issue in this forum, and that the matter was tried approximately five months after the seizure occurred. The Supreme Court has held considerably longer delays not to be *per se* violative of due process.

*See United States v. $8,850 in United States Currency*, 461 U.S. 555, 569, 103 S.Ct. 2005, 2014, 76 L.Ed.2d 143 (1983) (forfeiture proceedings commenced 18 months after seizure). *See also Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 547, 105 S.Ct. 1487, 1496, 84 L.Ed.2d 494 (1985) (nine month adjudication following loss of property interest). Further, the need to process related criminal proceedings may serve to justify a delay in conducting a post-seizure hearing. *United States v. Banco Cafetero Panama*, 797 F.2d 1154, 1163 (2d Cir.1986) (citing *United States v. $8,850*).

**4.** Messrs. Kleinpeter, Diiorio, and Yagoda offered no testimony relevant to the substantive issue in this action.

and conducting a superficial examination of the merchandise in search of possible quota/visa violations relating to textile importations. Tr. at 41, 53. On referral from Import Specialist Boland, Tr. at 48, he looked at the entry documentation, including the invoice, packing list, single country of origin declaration, and bill of lading, which indicated Japan as the country of origin. Tr. at 50. He also observed "inspection stickers," placed by independent packers, signifying that the merchandise, wherever produced, was exported from Japan. Tr. at 52, 54. While he made no independent inquiry into the facts surrounding the subject entries, cursory examination of the documents and comparison with the markings on the containers revealed no discrepancies with regard to country of origin. Tr. at 50, 53.

Mr. Boland, an import specialist assigned to John F. Kennedy Airport, classifies and appraises imported merchandise. Tr. at 59. He testified that Customs agents in Newark, New Jersey, informed him of an inquiry into a transshipment scheme involving Korean goods. Import Specialist Boland did not make a determination as to the correctness of the documents but noted that they "all reflected country of origin to be Japan." Tr. at 62. He executed a form announcing that the subject shipment had been "examined and released by Inspector McIntyre" and further directing those with problems concerning release of same to contact Mr. McIntyre. Plaintiff's Trial Exhibit 3; Tr. at 65–67. The goods, however, were never released.

Mr. Rudolpf Stierle, a Supervisory Paralegal Specialist in Newark, New Jersey, in charge of the Fines, Penalties and Forfeitures Office, testified, over objection of defendant's counsel, that he reviewed the report made by the seizing officer, Mr. McIntyre. He made no independent investigation as to whether there had been any violation of the Customs laws, but on the basis of the review conducted, he concluded that there had been such a violation. Tr. at 75–76.

Mr. Jacobus testified that his company is authorized by plaintiff to serve as its customhouse broker. He summed up his responsibilities as "mak[ing] entry for the goods coming into the country." Tr. at 116–17. He admitted that he did not have free access either to plaintiff's business records or its premises. Tr. at 148. He disavowed any independent knowledge concerning purchase orders and opined that Mr. Isaac Cavaliero was the individual at RJF with such knowledge. Tr. at 141, 145. Claiming it was reasonable to do so, Tr. at 152, Mr. Jacobus relied on invoices prepared by plaintiff's employees to complete the required entry documentation.[5] Tr. at 143. In short, he had no independent information as to any of the relevant transactions, and essentially passed on to Customs information received from plaintiff.[6] Tr. at 144.

---

**5.** This is underscored by the statement appearing in upper-case print on the invoice submitted to RJF by the broker:

Except for customs entries and duties, we are independent contractors, the submission of incomplete or inaccurate information related to an import entry (including descriptions, quantities, weights, purchase prices, discounts, commissions, changed selling prices at the time of exportation, assists, *country of origin*, etc.) makes you liable to severe governmental penalties and sanctions, in the event the information forwarded to us, or which accompanied the shipment, does not accurately reflect the entire transaction, it is essential that you immediately notify us so that we can take corrective action.

Plaintiff's Trial Exhibit 11 (emphasis added).

**6.** Mr. Jacobus was produced for deposition as agent of the corporate plaintiff pursuant to the Court's pre-trial order. In response, defendant moved to assess expenses and sanctions against plaintiff for failure to designate a suitable agent for deposition within the meaning of USCIT R. 30(b)(4). In an unpublished order, the Court, recognizing that the designation of Mr. Jacobus is in technical compliance with the literal terms of the order, and not wishing to stultify vigorous advocacy, denied the motion. The Court is mindful, however, that the plaintiff corporation is obligated to produce persons "who consent to testify on its behalf as to matters known or reasonably available to the organization." *Mitsui & Co. (U.S.A.), Inc. v. Puerto Rico Water Resources Auth.,* 93 F.R.D. 62, 66 (D.P.R.1981). Furthermore, where such individuals are otherwise unavailable, the corporation should appoint a new agent capable of testifying or producing documents as the situation requires. *See United States v. Lang,* 792 F.2d 1235, 1240 (4th Cir.), *cert. denied,* —— U.S. ——, 107 S.Ct.

At the close of plaintiff's case, the Court reserved decision on defendant's motion to dismiss for failure to state a *prima facie* case. Defendant then proceeded to present its case-in-chief. The Court now holds that plaintiff has failed to set forth a *prima facie* case supporting its contention as to country of origin and therefore its action is dismissed.

## Discussion

 Plaintiff has the burden of proving the country of origin of the textiles. 28 U.S.C. § 2639(a)(1) (1982). Further, Customs is presumed to have found every fact necessary to sustain its decision. *See W.A. Gleeson v. United States*, 58 CCPA 17, 21, C.A.D. 998, 432 F.2d 1403, 1406 (1970). Plaintiff contends that the entry papers, authenticated by its witnesses, are sufficient to establish a *prima facie* case. Since, in plaintiff's view, defendant has presented no evidence supporting its contention that the goods originated in Korea, plaintiff argues that it must prevail. *See Plaintiff's Post-Trial Brief* at 12–13. The Court disagrees.

██ Plaintiff relies principally on *United States v. Bloomingdale Bros. & Co.*, 10 Ct.Cust.App. 149, T.D. 38,400 (1920) for the proposition that "[n]ot only is the invoice *prima facie* evidence of that which it declares, but unimpeached and not mistrusted or discredited, it is *the* evidence which determines the collector's action as to all imported merchandise which has not been examined." *Bloomingdale*, 10 Ct.Cust.App. at 152. This broad language, however, must be understood within the factual context of that decision. First, in *Bloomingdale*, there was no objection to the admission of the invoice as evidence of its contents. *W.T. Grant Co. v. United States*, 23 Cust.Ct. 58, C.D. 1191 (1949), *aff'd*, 38 CCPA 57, 64, C.A.D. 440 (1950). "[T]he trial court [in *Bloomingdale*] was entitled in its discretion to give the invoice descriptions such weight as it felt they were entitled. The invoice descriptions being in evi-

dence, this court held on appeal that there was some evidence in the record to support the trial court's decision." *W.T. Grant Co.*, 38 CCPA at 64. Second, it is only proper to rely on invoices alone to prove their contents where the presumption of correctness has first been negated without regard to the documents. *See Joseph E. Seagram & Sons, Inc. v. United States*, 30 CCPA 150, C.A.D. 227, *reh'g denied per curiam*, 30 CCPA 158 (1943). *See also W.T. Grant Co.*, 38 CCPA at 67–68 (O'Connell, J., dissenting) (where independent evidence nullified presumption, invoice may serve as proof of facts contained therein).

The proper statement of the rule, expressed in a number of decisions, is that "invoices and papers accompanying the entries are not sufficient, standing alone, to overcome the presumption of correctness" attaching to Customs' decisions. *Colonial Metals Co. v. United States*, 61 Cust.Ct. 29, 33, C.D. 3521, 288 F.Supp. 396, 399 (1968) (country of origin certificate insufficient to establish goods as product of Cuba) (citing *United States v. Hercules Antiques*, 44 CCPA 209, C.A.D. 662 (1957)); *United States v. Ocean Brokerage Co.*, 11 Ct.Cust.App. 38, 41, T.D. 38,648 (1921); *Hull v. United States*, 10 Ct.Cust.App. 211, 213–15, T.D. 38,556 (1920); *United States v. Nat'l Aniline & Chem. Co.*, 3 Ct.Cust. App. 10, 17, T.D. 32,287 (1912); *Meier & Frank Co. v. United States*, 40 Cust.Ct. 656, 661, Reap.Dec. 9057 (1958) (dictum) (consular invoice alone insufficient to prove its contents). To hold otherwise would, in effect, render the presumption a nullity, since the importer could simply rest on documents previously rejected by Customs. *See Oakland Food Prods. Co. v. United States*, 32 CCPA 28, 30, C.A.D. 281 (1944). In the instant case, essentially the only proof offered were the documents. Simple examination of at least some of them reveal that they lack probative value. For example, as defendant notes, the Single Country of Origin Declaration is signed by Yoshio Nakamichi as export manager for

574, 93 L.Ed.2d 578 (1986); *In Re Two Grand Jury Subpoenae Duces Tecum*, 769 F.2d 52, 57 (2d Cir.1985); *United States v. Barth*, 591 F.Supp. 91 (D.Conn.), *aff'd in part, rev'd in part*

*and remanded*, 745 F.2d 184, 189 (2d Cir.1984), *cert. denied*, 470 U.S. 1004, 105 S.Ct. 1356, 84 L.Ed.2d 378 (1985).

Nakamichi Trading Co., Ltd., but there is no evidence whatsoever to establish his identity nor the veracity of his unsworn statement. *Defendant's Post-Trial Brief* at 5.

Plaintiff's witnesses contributed absolutely nothing beyond what was contained in the entry documents. Mr. Jacobus testified that he completed the entry papers based on information received from RJF, and he had no independent knowledge of the transaction at issue. Indeed, he has no knowledge of plaintiff's business affairs beyond that which is necessary to fulfill his role as customs broker. Nor does the testimony of the government agents add anything to plaintiff's case. Their "knowledge" of the country of origin was confined to reading the aforementioned entry documentation. The following statement, concerning testimony that goods had been imported directly into the United States, is applicable in the instant case:

> The witness had no first-hand knowledge as to where the merchandise came from, and was not in Holland when it was purchased. He testified that his knowledge of the purchases was derived from "what was put on the invoice and from bills that were given at the same time." Testimony based on such information is obviously hearsay and adds little evidentiary value to the invoices themselves. It seems clear that since the invoices are not sufficient to show that the collector's ruling is incorrect, the testimony of a witness who knows little or nothing about this particular importation except what he has learned from invoices, is equally insufficient.

*Hercules Antiques,* 44 CCPA at 214.[7]

Plaintiff misperceives the nature of these proceedings when it complains:

It would be a terrible inequity if the Government, by doing nothing, could succeed upon such a flimsy case in defense, and so avoid the burdens of proof that would be placed on it if it were forced to take the initiative in further legal action against RJF. In a criminal action, the Government would have to prove its case beyond a reasonable doubt. Even if Customs decided to bring a civil action under 28 U.S.C. 1582 in this Court to collect penalties under 19 U.S.C. 1592, the burden of proof would be allocated to the Government by that statute.

*Plaintiff's Post-Trial Brief* at 23. Plaintiff is obliged to prove its case as it, not defendant, has instituted this action. Plaintiff must be aware that it could have pursued other legal remedies,[8] but, whether for tactical or other reasons, it has chosen this forum to adjudicate this matter. Therefore, plaintiff must accept the evidentiary burden allocated to it by law. It may not point to what it views as an absence of evidence on defendant's part to substitute for its failure to produce credible evidence from those with direct knowledge as to the source of the goods.

## Conclusion

Plaintiff's case is insufficient to sustain its burden of proof and accordingly the motion to dismiss is granted.

---

7. Plaintiff's witness in *Hercules* had personal knowledge of long-standing industry practice concerning the type of goods being imported. Nonetheless, the court rejected his testimony since he lacked specific information as to the importations at issue. The testimony offered in the instant case is even less probative than that in *Hercules,* since the documents are the only source of information for the witnesses.

8. For example, a motion to compel forfeiture proceedings might properly lie. *See Castleberry v. Alcohol, Tobacco and Firearms Div. of the Treas. Dep't,* 530 F.2d 672, 674–75 (5th Cir.1976). If plaintiff has been subject to an unlawful seizure, it may be able to move for return of its merchandise pursuant to Fed.R.Crim.P. 41(e). *See generally United States v. Rapp,* 539 F.2d 1156 (8th Cir.1976); *Ross v. Meese,* 625 F.Supp. 971 (E.D.N.C.1986).